IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.   22-cr-00329-RMR

UNITED STATES OF AMERICA,

    Plaintiff,

v.

LEWIS BURTON RIDGEWAY,

    Defendant.

## MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Lewis Burton Ridgeway hereby moves this Court for an Order suppressing all evidence, including physical evidence and statements, which police obtained through unconstitutional seizures, searches, and interrogations. In support of this Motion, Mr. Ridgeway states the following:

### FACTUAL BACKGROUND

**I.  Four police officers are dispatched to investigate a "suspicious vehicle"**

In the early hours of May 12, 2022, Mr. Ridgeway was exhausted after a long day's work as an electrician and in desperate need of some shuteye. He was napping in his pickup truck, which was legally parked neatly within the lines of a parking space directly in front of the brightly lit entrance to a 24-hour 7-Eleven. The truck's engine was turned off and its headlights and taillights were switched on to keep the dashboard illuminated.

Just before 1:30 a.m., a 7-Eleven clerk phoned authorities to report that someone had been sleeping inside of a parked truck with "front end damage" for about an hour. (Ex. A at INV_214.) Moments later, four Arvada police officers were dispatched to the 7-Eleven parking lot to investigate a "suspicious vehicle." (Ex. B (dispatch audio) at 00:00.) Officers Tanis and Wonderly were first to

arrive on scene but waited for backup before initiating contact with Mr. Ridgeway. (Ex. A at INV_213-214.) While waiting, Tanis ran a records check of the truck's license plate, which revealed nothing irregular, just that it was legally registered to Mr. Ridgeway, who lived nearby in Arvada. (*Id.*)

## II. Police seize Mr. Ridgeway by physically blocking his truck's exit

About five minutes later, Officer Hammernik—a DUI enforcement officer—arrived with his trainee, Officer Rollins. (*Id.*) Rollins parked the patrol vehicle at a diagonal angle a few feet behind and to the right of Mr. Ridgeway's truck, boxing him into and preventing him from exiting his parking spot. (Ex. C at 00:15 (Hammernik Body Worn Camera (BWC)); Ex. D at 00:30 (Wonderly BWC).)

Hammernik and Rollins exited the patrol car and approached the driver's side of the truck as Tanis approached the passenger side. They shined their flashlights inside the truck while peering around. (Ex. C at 00:25.) Hammernik encouraged Rollins to take a thorough look inside of the truck, stating: "We've got all the time in the world, right? He's passed out." (*Id.* at 00:35.) They observed Mr. Ridgeway asleep with his keys and phone resting in his lap. (Ex. E at INV_5, 13.) The truck's headlights and taillights were on, but the engine was off. (*Id.*) Officers also noticed the body damage on the truck's front end, but thought it was old. (*Id.* at INV_5) Significantly, they observed nothing indicating that Mr. Ridgeway was intoxicated, such as alcohol containers, drugs, or drug paraphernalia. (*Id.*; Ex. D at 05:10) Nor did they smell alcohol or drugs. (*Id.*; Ex. E at INV_5, 13.)

## III. Police order Mr. Ridgeway to exit the truck and inquire about substance use

Mr. Ridgeway awoke as officers were conversing with each other and shining their flashlights inside of his truck. (Ex. C at 01:04; Ex. E at INV_5.) Rollins then knocked on the driver's side door and directed Mr. Ridgeway to roll down his window. (Ex. C at 01:05.) Mr. Ridgeway began to comply with this order by putting the key into the ignition—which was necessary to roll the window down—but then received an order from Tanis to exit the car. (*Id.*) In rapid succession, officers on both sides of the truck began to pound on the truck and pull on the door handles while shouting, "Roll it down!"

2

and "Drop the keys, get out of the car, do it now, get off on this side!" (*Id.*)

Confused by the abrupt wakeup and conflicting orders, Mr. Ridgeway took a few moments to unlock the car and open his door, after which he exited with his hands up in the air. (*Id.* at 01:40.) His phone, which was previously sitting in his lap, slid to the ground as he stepped out of the truck. (*Id.*) At Rollins' direction, Mr. Ridgeway then scooched through the tight passageway between another parked car and Rollins on his right side and the truck on his left side, keeping his hands in view and dragging his elbow along the side of the truck because of the narrow space. Officers did not smell alcohol, marijuana, or any other drug odors on his person. (Ex. E at INV_5.)

Rollins ordered Mr. Ridgeway to put his hands above his head and frisked him. (Ex. C at 02:00.) At Hammernik's direction, Rollins then ordered Mr. Ridgeway to follow her as she walked away from the truck, which Mr. Ridgeway did with a slight limp (as he later informed police, he has "hardware" in both of his knees from a past surgery). (*Id.* at 02:40; 04:55.) Rollins asked Mr. Ridgeway several questions, including whether he had had anything to drink or had taken any drugs recently; Mr. Ridgeway calmly and coherently responded that he had not. (*Id.* at 04:00.)

### IV. Police conduct field sobriety tests and arrest Mr. Ridgeway for DUI

Rollins asked Mr. Ridgeway if he would voluntarily participate in standardized field sobriety tests (FSTs), and he agreed. (*Id.* at 04:25.) After conducting the FSTs, Rollins consulted with Hammernik, who then asked Mr. Ridgeway, "What are you on right now, man?" (*Id.* at 13:20.) Mr. Ridgeway answered, "I'm not on anything. I'm sleepy." (*Id.*). Hammernik asserted in response that Mr. Ridgeway was "swaying like nobody's business." (*Id.*) The video recording shows the opposite, with Mr. Ridgeway exhibiting no difficulty maintaining his balance throughout the encounter, even at times when both hands are in his pockets. (*See, e.g.*, *id.* at 04:30.)

Hammernik continued to pepper Mr. Ridgeway with questions and subjected Mr. Ridgeway to additional sobriety testing. Several minutes later, Hammernik told Mr. Ridgeway that he was under

3

arrest for suspected DUI. (Ex. C at 22:20.) Mr. Ridgeway was handcuffed and searched incident to arrest by Rollins, who located a firearm in Mr. Ridgeway's pocket.[1] (*Id.* at 24:00.) Hammernik then asked Mr. Ridgeway several incriminating questions, including what type of firearm it was, why it had no serial number on it, and whether it was registered. (*Id.* at 24:53-25:31.) Afterwards, police drove Mr. Ridgeway to the police station for booking, where Officer Dunn asked him more incriminating questions. (Ex. F.) At no point did any officer inform Mr. Ridgeway of his *Miranda* rights.

After arresting Mr. Ridgeway, police seized his truck but kept it sitting in the impound lot for twelve days before Detective Grisham finally applied for a warrant to search it. (Ex. G at INV_63.) And despite receiving the search warrant at 3:30 p.m. on May 24, 2022, Grisham waited yet another day, until May 25, 2022, to execute it. (Ex. H at INV_54.) All the while, Mr. Ridgeway and his fiancée worked diligently to reclaim possession of their truck by repeatedly calling the police department and impound lot, hand-delivering a notarized letter authorizing release of the truck to a trusted friend, and even appearing at the impound lot on two occasions. Thirteen days after the impoundment, Grisham finally executed the search warrant and discovered additional evidence in the truck.[2]

## ARGUMENT

**I.   All evidence must be suppressed because the government will be unable to meet its burden to justify the warrantless seizures of Mr. Ridgeway.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects[] against unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures conducted in the absence of a warrant are presumptively unreasonable. *United States v. Venezia*, 995 F.3d 1170, 1174 (10th Cir. 2021) (citations omitted). Accordingly, the government bears the burden of proving that a specific exception to the warrant requirement applies. *Id.* at 1175-76.

---

[1] Rollins was subsequently fired for failing to locate this firearm during her initial frisk. (Ex. I.)
[2] Such evidence included drug paraphernalia, trace amounts of marijuana (.27 grams) and methamphetamine (1.46 grams), one loose 9mm bullet, and a magazine with ten 9mm bullets. (Ex. H at INV_54.)

4

**A. The officers' initial seizure of Mr. Ridgeway was unreasonable.**

An officer may conduct a brief, investigatory seizure (*i.e.*, a "*Terry* stop") only "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion must be supported by articulable facts amounting to an "objective justification"; an "inchoate and unparticularized suspicion or hunch" of criminal activity will not suffice. *Id.* The government bears the burden of articulating specific facts sufficient to support reasonable suspicion. *Brown v. Texas*, 443 U.S. 47, 52 (1979).

Here, officers detained Mr. Ridgeway immediately upon arriving at the 7-Eleven parking lot by physically blocking his truck and preventing it from leaving the lot. This seizure comported with the Fourth Amendment only if officers had reasonable, articulable suspicion to believe that Mr. Ridgeway was engaged in criminal activity. They did not.

**1. Mr. Ridgeway was seized from the moment that the officers parked their patrol car directly behind his truck and blocked it in the parking space.**

A person is considered seized for Fourth Amendment purposes when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19 n.16. When an officer physically restricts a suspect's freedom of movement by blocking his car, and thereby prevents him from driving away, he has initiated a *Terry* stop that must be supported by reasonable suspicion. *See, e.g.*, *United States v. Goebel*, 959 F.3d 1259, 1266 (10th Cir. 2020) (acknowledging rule and listing supporting cases but finding no *Terry* stop because defendant was not inside car when its exit was temporarily blocked by officer's vehicle); *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (*Terry* stop where officer parked police cruiser directly behind car in which defendant was sleeping, boxing the car into its parking space); *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) (*Terry* stop where officer parked cruiser in a position that physically prevented defendant's parked car from driving away).

Here, Officers Hammernik and Rollins parked the patrol car a few feet behind and angled to

5

the right of Mr. Ridgeway's truck, boxing the truck into its parking spot and preventing its exit. (Ex. C at 00:24.) This conduct by police physically "restrained the liberty" of Mr. Ridgeway and thus constituted a seizure. *See Terry*, 392 U.S. at 19 n.16; *Gross*, 662 F.3d at 399; *See*, 574 F.3d at 313.

   2. **Police lacked reasonable suspicion to believe that Mr. Ridgeway was engaged in criminality when they blocked in his truck.**

Yet, officers lacked reasonable suspicion to support this immediate seizure. When Hammernik and Rollins parked their patrol car behind Mr. Ridgeway's truck, they knew only what dispatch had reported and what they could observe as they approached: (i) someone had been sleeping inside of a white truck with front-end damage in the 7-Eleven parking lot for approximately one hour; and (ii) the truck was parked inside of the parking lot lines, with its engine off and headlights and taillights on.

Of course, sleeping in a parked vehicle is not a crime. People sleep inside of parked cars for countless, perfectly legal (and even commendable) reasons: to allow bouts of drowsiness to pass before continuing to drive; to catch up on sleep or to pass time while waiting for a companion to run errands; or to save on housing costs when money is tight. *See United States v. Batara-Molina*, ---- F.4th ----, 2023 WL 2147326, at *5 (10th Cir. Feb. 22, 2023) (published) (error for district court to treat defendant's "sleeping at gas stations or rest stops" as suspicious, explaining that "courts should not treat these cost-cutting measures as suspicious, lest they conflate poverty with crime"). Nor is it suspicious for a car parked at night to have its engine off and headlights and taillights on, given that most older model cars require the headlights/taillights function to be switched on to illuminate the dashboard. *See id.* ("Courts should not deem an action reasonably suspicious if it 'describe[s] a very large category of presumably innocent travelers.'" (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

Further, the positioning of the truck—parked neatly within the lines of a parking space directly in front of an open convenience store—suggested no criminal activity either. In fact, it was consistent with someone who was *not* engaging in criminal activity, as it meant that the vehicle's occupant was unconcerned with allowing 7-Eleven passersby to see inside of his vehicle (unlike someone who parks

6

in a secluded or dark area of a parking lot to obscure, for example, illicit drug use). Nor did police observe anything suspicious moments later when they approached the truck as Mr. Ridgeway awoke; they took a thorough look inside and observed nothing consistent with DUI or illegality—no smell of alcohol or drugs and no alcohol bottles or drug paraphernalia.

In short, there was nothing about Mr. Ridgeway's actions or chosen nap spot that was suggestive of criminality, and, consequently, the officers' initial *Terry* stop was unconstitutional. *See, e.g., Gross*, 662 F.3d at 399 (no reasonable suspicion where police observed vehicle parked in public parking lot—with engine running—in early morning hours with passenger "slumped down" in the front passenger seat because sleeping in car was not a "particularized and objective basis" for suspecting vehicle's occupant of criminal activity); *State v. Smith*, 513 P.3d 629, 639 (UT 2022) (no reasonable suspicion where defendant was asleep in his car—with the engine running—parked in the lot of a 24-hour McDonald's at 2:30 a.m. because this conduct did not constitute "objective evidence of any criminal wrongdoing"); *People v. Larkin*, 90 N.Y.S. 3d 814, 818 (N.Y. App. 2018) (no reasonable suspicion where defendant was either "passed out" or "sleeping in a contorted position" in driver's seat of vehicle—with the engine running and lights on—parked in a gas station parking lot at 3:00 a.m., explaining that "[t]he fact that the sleeping defendant's position appeared uncomfortable and that defendant exhibited difficulty in being awakened and disorientation upon being awakened, did not provide the trooper with a reasonable belief that defendant was, in fact, 'involved in criminal acts'"); *Danielewicz v. State*, 730 So. 2d 363, 364 (Fla. Dist. Ct. App. 1999) (no reasonable suspicion where defendant was asleep in her car, with the engine running and headlights on, parked in the lot of an open restaurant/bar at 1:30 a.m. because "people sleep in their cars without criminal implication").

### 3. The community-caretaking exception does not apply.

The Court should reject any attempt by the government to rely on the community-caretaking exception to justify the seizure of Mr. Ridgeway. This exception applies in very limited circumstances

when police actions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). As a result, even where police *could* have chosen to perform their community-caretaking role, the exception cannot be used as an after-the-fact excuse when what police *actually did* was conduct a criminal investigation. *See Smith*, 513 P.3d at 641 (community-caretaking exception does not apply where "[a]t best, the officers had only a secondary purpose in ascertaining [defendant's] wellbeing while simultaneously investigating a DUI; [and] at worst, the officers had no intention to provide aid and merely post-facto sought to justify a warrantless criminal seizure"). Here, the officers' actions demonstrate that they were conducting a criminal investigation based on an unsupported hunch that the truck's occupant was committing a crime—not a welfare check of the occupant for community caretaking purposes.

As an initial matter, police were dispatched to investigate a "suspicious" vehicle, not to offer help to its occupant. Further, despite Tanis and Wonderly arriving at the scene first, they waited several minutes for Hammernik—a DUI enforcement officer—to arrive before making any attempt to approach the vehicle. *Cf. Smith*, 513 P.3d at 640 (officer's choice to wait for backup before approaching defendant was "inconsistent" with conducting welfare check). When officers did approach Mr. Ridgeway, they never once asked if he was okay, but instead shouted orders at him to exit the truck. And after Rollins began questioning Mr. Ridgeway, who was compliant and composed, Wonderly actually left the scene, stating: "This wasn't as exciting as I was hoping it would be." (Ex. D at 06:10.) In sum, these actions were not "totally divorced from the detection, investigation, or acquisition of evidence relating to" a criminal violation. *Cady*, 413 U.S. at 441.

Finally, even if the circumstances had justified a community caretaking response, the officers' actions were excessive in scope, as "any purported community-caretaking function in this instance could have been accomplished through a consensual encounter[.]" *Gross*, 662 F.3d at 400. Even on-scene officers seemed to believe that the initial seizure was overkill. (*See* Ex. D at 03:00 (Wonderly:

8

"You gotta do less than that." Tanis: "I know.") Nothing prevented officers from parking in the open space to the right of the truck, knocking on its window, and asking Mr. Ridgeway if he was alright or in need of help. But because nothing about the encounter indicates that officers were performing a community-caretaking role, the community-caretaking exception cannot save the day.

> **B. The government must also prove that the officers' continued detention and arrest of Mr. Ridgeway were reasonable.**

The government also bears the burden to justify officers' continued detention and eventual arrest of Mr. Ridgeway. After pulling Mr. Ridgeway out of the car, officers did not see any indicia of drug or alcohol use in his car and did not smell alcohol or drugs on Mr. Ridgeway's person; he denied any recent drug or alcohol use; he did not have trouble walking or speaking with officers; he spoke in a calm and respectful tone; he willingly agreed to perform FSTs; and he performed well on the three initial FSTs: (1) the "horizontal gaze nystagmus" (HGN) test; (2) the "walk and turn maneuver"; and (3) the "one leg stand" test. With respect to the first test, no nystagmus was present. (Ex. C at 13:15 ("No HG?").)  As for the second test, he took all nine steps in both directions and did not once stop walking, miss heel-toe contact, step out of line, or raise his arms for balance. (*Id.* at 11:20.) For the third test, Mr. Ridgeway stood on one foot for ten seconds and a second time for five seconds before Rollins directed him to stop. (*Id.* at 12:40.)

After this set of FSTs was complete, the officers should have released Mr. Ridgeway because the totality of the circumstances indicated that he was not under the influence of anything. Instead, they continued to detain him. At the hearing, the government will bear the burden of pointing to specific facts showing that—despite the mounting evidence that Mr. Ridgeway was merely tired and not inebriated—officers still had reasonable suspicion to detain him. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop").

The government will also have the burden to show that police had probable cause to arrest

9

Mr. Ridgeway. In doing so, it will not be permitted to rely on statements that Mr. Ridgeway made in response to Hammernik's accusatory and coercive questions about being under the influence of drugs, as he failed to comply with *Miranda* before conducting such questioning. *See infra* at sec. III.A.; *United States v. Chavez*, 985 F.3d 1234, 1245-46 (10th Cir. 2021) (unmirandized statements cannot be used to support probable cause). And to rely on the results of the FSTs to establish probable cause to arrest, the government must show that (1) the tests were sufficiently valid and reliable to detect impairment; (2) the officers were adequately trained to administer the tests; (3) the tests were administered properly; and (4) the results of the tests clearly showed Mr. Ridgeway's impairment. *See Thibault v. Wierszewski*, 695 F. App'x 891, 898 (6th Cir. 2017); *United States v. Horn*, 185 F. Supp. 2d 530, 537 (D. Md. 2002); *State v. Rose*, 86 S.W.3d 90, 98 (Mo. Ct. App. 2002). If the government fails to make this showing at the evidentiary hearing, the Court should suppress all evidence flowing from the unlawful arrest.

## II.     All evidence deriving from the search warrant for Mr. Ridgeway's truck must be suppressed because the police unreasonably delayed in seeking it.

A seizure of property that is lawful at its inception may nevertheless violate the Fourth Amendment if an officer unreasonably delays in obtaining a warrant to search that property. *United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013). There is no per se amount of time that renders a delay reasonable or unreasonable; three days may be unreasonable in one case and three months may be reasonable in another. *Id.* To assess whether an officer's delay in seeking a search warrant was unreasonable, courts must view "the totality of the circumstances" and "'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quotation omitted).

Here, weighing the significant intrusions on Mr. Ridgeway's Fourth Amendment interests against the government's purported reasons for waiting thirteen days to seek and execute a search warrant render the delay constitutionally unreasonable. Each day that officers kept Mr. Ridgeway's

truck in the police impound lot, his Fourth Amendment interests continued to be invaded, including his right to: (i) possession; (ii) privacy; (iii) exclude others; and (iv) be free from property-based government intrusions such as conversion and trespass. *See Christie*, 717 F.3d at 1162; *Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018); *United States v. Jones*, 565 U.S. 400, 406-409 (2012).

And these intrusions were not merely theoretical. During the thirteen days that police left the truck sitting in the impound lot, Mr. Ridgeway was unable to share use of it with his fiancée; he could not arrange for its safekeeping and ensure it was protected from damage, theft, or weather conditions; he was prevented from taking it to an auto shop to have the front end damage repaired; he could not remove and protect valuable, non-contraband items inside of it, such as his electrician tools and copper wire; and he could not access important paperwork and belongings inside of it—as he was in the process of moving apartments and was storing items inside of the truck. It was for these reasons that Mr. Ridgeway and his fiancée so immediately and ardently attempted to seek its return. Under these circumstances, the delay constituted a significant intrusion of Mr. Ridgeway's Fourth Amendment interests. *Compare Christie*, 717 F.3d at 1163-64 (defendant's Fourth Amendment interest in her computer was significantly diminished because her husband, a co-owner of the computer, "voluntarily relinquished" it to police and she took no action to seek its return during the five-month seizure) *with United States v. Mitchell*, 565 F.3d 1347, 1350-51 (11th Cir. 2009) (three-week seizure of defendant's hard drive constituted a "significant interference" with his possessory interest in it, given that it likely contained personal, non-contraband items of value to him).

Because Mr. Ridgeway's Fourth Amendment interests were significantly impacted by the police delay in seeking a search warrant, the government must point to a "compelling justification" for it. *Mitchell*, 565 F.3d at 1351 (insufficient reason for delay where other agents could have undertaken search in lead detective's two-week absence and warrant affidavit was not lengthy or complicated). It will be unable to do so. As an initial matter, Detective Grisham was not called away

11

to work on other, higher priority cases. *Cf. Mitchell*, 565 F.3d at 1351. Rather, his police report reveals that during the thirteen-day delay, his time and attention were spent on Mr. Ridgeway's case, just not on the search warrant. (*See* Ex. H.) But even if the government could theoretically point to other assignments that prevented Grisham from obtaining and executing a search warrant for thirteen days, they will be unable to show that not a single other officer in the Arvada Police Department could have completed that task instead. *See id.* Finally, as in *Mitchell*, this was not a particularly complex, difficult, or time-consuming search warrant application to put together. Grisham's affidavit was a mere five pages and contained largely boilerplate language about his qualifications and Mr. Ridgeway's arrest, which Grisham copied and pasted from reports already written by other officers. (*See* Ex. G.)

In sum, the totality of the circumstances renders Grisham's thirteen-day delay in seeking and executing a search warrant of Mr. Ridgeway's truck far more analogous to the delay in *Mitchell* than in *Christie*. Mr. Ridgeway's Fourth Amendment interests in his truck were robust and undiminished, like in *Mitchell* and unlike in *Christie*. Further, Mr. Ridgeway's truck was seized against his will and without his consent, as in *Mitchell* and unlike in *Christie*. And in contrast to the defendant in *Christie*, who at no point during the five-month seizure took any affirmative action to seek the return of her computer, Mr. Ridgeway and his fiancée sought the return of his truck from the police impound lot as expeditiously as possible within hours of his arrest. Finally, as in *Mitchell*, there is no evidence to suggest that Grisham had a compelling reason for waiting so long to seek a search warrant. Accordingly, the Court should suppress all evidence deriving from the search of Mr. Ridgeway's truck.

### III. All statements made by Mr. Ridgeway while under custodial interrogation should be suppressed because he was never advised of his *Miranda* rights.

*Miranda v. Arizona*, 384 U.S. 436 (1966) established procedural safeguards intended to inform suspects of their Fifth Amendment privilege against compelled self-incrimination and to protect against the "'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010). Pursuant to *Miranda*, police must apprise a suspect of his rights to remain silent and

have an attorney present when two conditions are satisfied: an individual is (1) in "custody," and (2) subjected to "interrogation." *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (citations omitted). Statements obtained in contravention of *Miranda* are inadmissible in the government's case-in-chief and must be suppressed. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). Further, unmirandized statements cannot be used by the government in a suppression hearing to support a finding of probable cause. *Chavez*, 985 F.3d at 1245. A person is considered in "custody" for *Miranda* purposes "when a reasonable person in the suspect's position would understand his or her situation as the functional equivalent of formal arrest." *Guillen*, 995 F.3d at 1109. An "interrogation" for *Miranda* purposes encompasses not only express questioning by police but also any words or actions on the part of the police that are "'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Indeed, it suffices for police to make statements that "posit the guilt" of the suspect or that "attempt[] to discuss the crime under investigation." *Id.*

Here, police never informed Mr. Ridgeway of his *Miranda* rights. Accordingly, he seeks to suppress statements that he made during three separate instances of custodial interrogation: (1) the accusatory questioning by Officer Hammernik about Mr. Ridgeway's sobriety after Mr. Ridgeway completed the first round of FSTs; (2) the post-handcuffing questioning by Officer Hammernik; and (3) the booking questioning by Officer Dunn.

### A. The Accusatory Sobriety Questioning

*Miranda* custody extends beyond situations in which the police formally arrest and handcuff a suspect. *Guillen*, 995 F.3d at 1110-11; *United States v. Revels*, 510 F.3d 1269, 1274 (10th Cir. 2007) ("some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment [but] may nonetheless create the custodial situation in which *Miranda* was designed to operate"). In *Guillen*, the officers' in-home interrogation became custodial when police

13

confronted the defendant with evidence suggesting his guilt, in an accusatory manner, and there was little left for police to do other than arrest him. *Id.* Under these circumstances, a suspect is in custody for *Miranda* purposes because someone in the suspect's shoes would feel an arrest was imminent and experience a degree of coercion similar to that of a formal arrest. *Id.*

Likewise, here, the encounter turned custodial when Hammernik directly accused Mr. Ridgeway of being under the influence and confronted him with evidence purporting to prove his guilt. After the first round of FSTs, there was little left for police to do but let Mr. Ridgeway go or arrest him. But they did not release him. Hammernik instead asked, "What are you on right now, man?" Mr. Ridgeway once again denied being impaired, explaining that he was just sleepy. Hammernik would not accept this answer, and directly confronted Mr. Ridgeway with purported evidence that he was under the influence: "You're swaying like nobody's business. Like, you're standing here, you've got the death glare, and you can't—you're like this [*tilts sideways*]." (Ex. C at 13:30.) In response to this direct accusation, Mr. Ridgeway immediately confessed to marijuana use. Although Mr. Ridgeway had not yet been formally arrested, he was nonetheless in "custody" for *Miranda* purposes because, as in *Guillen*, a person in Mr. Ridgeway's shoes would have believed arrest was imminent. *See* 995 F.3d at 1110-11. Accordingly, all responses to Hammernik's questions about substance use were obtained in violation of *Miranda* and cannot be used by the government at the suppression hearing to show probable cause to arrest. *See Chavez*, 985 F.3d at 1245-46.

### B. The Post-Handcuffing Questioning

After police told Mr. Ridgeway that he was under arrest for DUI and handcuffed him, Rollins searched his person incident to arrest, discovered a firearm in his pocket, and handed it to Hammernik. Hammernik inspected the seized firearm and asked, "Is this a sig?" (referring to a type of firearm, *see* https://www.sigsauer.com/firearms.html). After Mr. Ridgeway responded, Hammernik continued: "Yeah, I was wondering why there's no serial number on it . . . . So, what you're saying is it's not

registered . . . . So, it's a ghost gun is what you're saying . . . . Yeah, which, is not legal." (Ex. C at 24:53-25:31.) There can be no dispute that Mr. Ridgeway was in custody at this point, given that he had been formally arrested, handcuffed, and searched. Further, asking Mr. Ridgeway an express question about the brand of firearm that was just seized from his pocket and making accusatory comments about the illegality of having a non-registered firearm without a serial number constitute statements that are "reasonably likely to produce an incriminating response." *See Rambo*, 365 F.3d at 909-910. Because Hammernik did not advise Mr. Ridgeway of his *Miranda* rights before subjecting him to this questioning, the Court should suppress all of Mr. Ridgeway's responses.

### C. The Booking Questioning

After Mr. Ridgeway was transported to the police station, and indisputably still in custody, Officer Dunn was completing standard booking procedures when she asked Mr. Ridgeway "if the piece on the back of the gun he was found to be in possession of was a sear," referring to a mechanism that can be attached to the hammer of a firearm to allow the discharge of multiple rounds with a single trigger pull. (Ex. F.) This express question about the potentially illegal features of the firearm seized from Mr. Ridgeway was a plain "attempt[] to discuss the crime under investigation," *Rambo*, 365 F.3d at 909-910, and thus constituted "interrogation" for *Miranda* purposes. Accordingly, the Court should suppress all statements Mr. Ridgeway made in response to Dunn's question.

## CONCLUSION

For the above reasons, Mr. Ridgeway respectfully requests that the Court grant the Motion.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Jennifer Beck
JENNIFER BECK
s/ Amy W. Senia
AMY W. SENIA
Attorneys for Defendant

15

**CERTIFICATE OF SERVICE**

   I hereby certify that on March 7, 2023, I electronically filed the foregoing ***Motion to Suppress Evidence and Statements*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail address:

  Al Buchman, Assistant United States Attorney
  Email: Al.Buchman@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

  Lewis Burton Ridgeway (Via U.S. Mail)

            s/ Jennifer Beck
            JENNIFER BECK
            Assistant Federal Public Defender
            633 17th Street, Suite 1000
            Denver, CO  80202
            Telephone: (303) 294-7002
            Jennifer_Beck@fd.org
            Attorney for Defendant