**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.  22-cr-00329-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LEWIS BURTON RIDGEWAY,

      Defendant.

_____

**RESPONSE TO MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**
_____

The United States of America respectfully files this response to the defendant's Motion to Suppress Evidence and Statements. ECF 25. In opposition, the government asserts that officers had reasonable suspicion from the outset and throughout investigation to justify detention and all actions taken. This eventually turned into probable cause justifying the formal arrest by handcuffs. Statements made prior to the that arrest were made when he was not in custody and not in violation of *Miranda*. The government does not intend to admit any statements post-arrest nor fruits of the search warrant, so the remaining issues are moot.

## FACTS

On May 12, 2022, at 1:32 AM, Arvada Police Department officers were dispatched to the 7-Eleven in Arvada, Colorado. The officers possessed the following information from T.L, an identified 7-Eleven employee, which was reported through computer aided

1

dispatch (CAD): (1) Truck with damage and male passed out behind the wheel, (2) Front end damage, (3) Been in area for about an hour, (4) No tag on front and vehicle is pulled in (5) Poss drug or alcohol. *See* ECF 25-A, p. 2 (CAD, identifying the caller).

Officers Matthew Tanis was the first to arrive. He did not block the vehicle but rather approached the truck and observed: heavy front end damage to the truck, the defendant passed out in the driver's seat, keys in his lap, and headlights and brake lights illuminated but engine off. Officer Tanis waited for cover officers to arrive. ECF 25-E, p. 11. At some point, Officer Brian Wonderly arrived separately and activated his body worn camera (BWC). *See* ECF 25-A, p. 2 (different unit numbers), 25-D (Wonderly's BWC). Much of the subsequent events were captured on BWC, but Arvada Police Department had not yet issued BWC to all officers at that time.

Field Training Officer Matthew Hammernik and his trainee Officer Michaela Rollins arrived and pulled their vehicle behind the defendant's truck, which camera confirms had illuminated brake lights. ECF 25-E, p. 3; 24-D (00:10). Officer Hammernik accompanied his trainee throughout the contact. *See* ECF 25-C. They approached the truck on the driver's side, while Officer Tanis approached the passenger side. ECF 25-D (0:50), 25-C (00:22). There, all three officers observed the defendant asleep, sitting at the wheel with his "chin resting on his chest" and vehicle keys and phone on his lap. ECF 25-E, p. 4. In fact, Officer Hammernik noted that the defendant was clearly unconscious. ECF 25-C (00:41). Officer Rollins looked in the cab, tapped on the closed window with her flash-light, and requested the defendant to roll the window down. *Id.* (00:41-1:09).

At that point, the defendant awoke, picked up the keys, and attempted to put them

in the ignition, with difficulty. *Id.* (1:25); ECF 25-E, p. 4. This prompted officers to order him to exit the car and try to open the locked door. ECF 25-E, p. 4; *see* 25-C (1:19-1:38). The defendant eventually submitted by opening the door. ECF 25-C (1:38). He stumbled out and had difficulty balancing. *Id.* (1:50-2:00). Officer Hammernik saw a suspected knife clip in the defendant's pocket, and Officer Rollins patted him down to remove the knife. *Id.* (1:57). She missed, however, the gun and ammunition in defendant front shirt pocket, which was found later in a search incident to arrest. *Id.* (23:48). In these early observations, Officer Hammernik observed the defendant "stumbl[e] heavily," have bloodshot eyes, "low" speech, continuously swayed, and had body tremors, all signs of impairment. ECF 25-E, pp. 4-5; *see also* ECF 25-C (1:46-1:55); 25-D (3:13-3:20) (the defendant visibly stumbling after the frisk).

Officers Rollins and Hammernik then briefly questioned the defendant, and he admitted to driving but denied being impaired. He also consented to standard field sobriety tests (SFSTs). *Id.* (3:16-6:20). Officer Rollins conducted those tests in view of Officer Hammernik [*id.* (6:20-13:10)], who has specialized training in drug recognition: certification in SFSTs and Advanced Roadside and Impaired Driving Enforcement (ARIDE), a Drug Recognition Expert Course, and work as an impaired driving instructor for the Arvada Police Department. Ex. 1 (officer's CV); *see United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (specialized training a factor in reasonable suspicion).

After the defendant completed the first three tests, Officer Hammernik and the visibly confused defendant briefly conversed: the defendant initially denied but then admitted to smoking pot and not being completely sober. *See* ECF 25-C (13:10-16:02);

*see* ECF 25-E, p. 4. Officer Hammernik next conducted ARIDE testing, to which the defendant also consented. ECF 25-C (16:02-20:50). In the tests, the defendant displayed "clues" or indicators of impairment by drugs. *See* Ex. 2 (field notes); ECF 25-E, pp. 4-6.

Officer Hammernik advised defendant that he was being arrested and handcuffed him. ECF 25-C (22:20). In a subsequent search incident to that arrest, Officer Rollins recovered a handgun (unserialized, so no interstate determination could be made) loaded with ammunition from the defendant's front shirt pocket. *Id.* (23:48) After arrest on scene and during booking, the defendant made statements without a *Miranda* advisement. *Id.* The defendant's blood was tested, which showed methamphetamine and amphetamine in his system. A search warrant on the defendant's truck was executed 13 days later.

## OFFICERS HAD REASONABLE SUSPICION

The defendant primarily challenges the justification for and scope of the investigatory stop. *See* ECF 25, pp. 5-7. But based on the totality of circumstances, the police had reasonable suspicion from the outset, throughout the encounter, and never exceeded the scope of their impaired driving investigation.[1]

Generally, to initiate an investigative, "*Terry*" stop, officers collectively need reasonable suspicion based on the totality of the circumstances that the person may be involved in criminal activity. *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015); *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008) (collective-

---

[1]    The government does not argue but does not concede the applicability of the community caretaker exception under *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973). "Welfare checks" are permitted in Colorado by the state's interpretation of the Fourth Amendment. *E.g., People v. Martin*, 338 P.3d 1106, 1114 (Colo. App. 2014).

knowledge doctrine). Reasonable suspicion must be "particularized and objective," but it "is not, and is not meant to be, an onerous standard." *Id.* (cleaned up). It "requires 'considerably less' than a preponderance" and exists "even if it is more likely than not that the individual is *not* involved in any illegality." *Id.* (cleaned up). In that vein, officers need not rule out innocent explanations for activity and may rely on probabilities and common sense. *Kansas v. Glover*, 140 S. Ct. 1183, 1190 (2020). Reasonable suspicion is viewed objectively "from the perspective of the reasonable *officer*"—not the defendant—with the actual officers' knowledge. *Guerrero*, 472 F.3d at 787 (cleaned up). Fundamentally, the Court should give deference to a law enforcement officer's ability to distinguish between innocent and suspicion actions, and officers may "draw on their own experience and *specialized training* to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 268 (2002)) (emphasis added); *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

### a. The defendant was not seized until he was ordered out of the truck.

Reasonable suspicion is needed at the point of seizure. Seizure under the Fourth Amendment is when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A person is seized when an officer "by means of physical force or show of authority" terminates or restrains his freedom of movement, but, importantly, "there is no seizure without actual submission; otherwise there is at most an attempted seizure." *Brendlin v. California*, 551 U.S. 249, 254 (2007); *see California v.*

*Hodari D.*, 499 U.S. 621, 626-27 (1991).

The police indisputably showed their authority by blocking the truck. However, the defendant was unconscious at the wheel, and it was only when the police woke him that he become aware of their presence at all. Founded on *Brendlin* and *Hodari D.,* the Colorado Supreme Court in *Tate v. People* held in nearly identical circumstances, "a person who is unconscious clearly cannot perceive that there has been a show of authority directed at him, and the defendant could therefore not be seized within the contemplation of the Fourth Amendment until he awoke." 290 P.3d 1268, 1269-70 (Colo. 2012). The Tenth Circuit has reasoned in a manner that would not be inconsistent with *Tate. See United States v. Salazar*, 609 F.3d 1059, 1067-68 (10th Cir. 2010); *United States v. Mosley*, 743 F.3d 1317, 1327 (no seizure until raised his hands to drawn gun).

To be sure, it was not until police ordered the defendant out of the car that he finally became aware of the police presence and was thus seized. He had not submitted before that moment. *See* ECF 25-C (1:19-1:38). At that point, police were required to have reasonable suspicion.

### b. Officer Tanis had reasonable suspicion upon first arrival.

Regardless of when the defendant was actually seized, however, police had reasonable suspicion to conduct an investigatory stop upon first arrival for both a license plate violation and driving while ability impaired.

Addressing the first, under C.R.S. § 42-3-202, failure to attach a front and rear license plate is a traffic infraction. Officers are also able to utilize investigatory stops to investigate traffic infractions. *Rodriguez v. United States*, 575 U.S. 348, 349 (2015);

*United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007); *People v. Brant*, 252 P.3d 459, 462 (Colo. 2011). Through T.L.'s call relayed through the CAD, the officers here had knowledge that no front plate was attached to the defendant's truck before arrival. Thus, officers had reasonable suspicion from the outset to investigate this infraction independent of any impaired driving. *See United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011) (a tip can support reasonable suspicion for traffic stop). The officers were justified in detaining the vehicle and ordering the defendant out. *See United States v. Dennison*, 410 F.3d 1203, 1211 (10th Cir. 2005) ("[A]n officer making a traffic stop may order … the driver … to exit the vehicle pending completion …"). As a practical matter, this is no different than every-day traffic stops for infractions like speeding. The officers checked the registration to confirm the defendant as owner and also observed the truck's missing plate on approach. *See* ECF 25-A, p. 2 (registration check); 25-C (0:57).

Second, the officers reasonably suspected that the defendant was involved with driving while ability impaired, a lesser form of driving under the influence, per C.R.S. §§ 42-4-1301(1)(b) and (1)(g), which prohibits driving while affected by alcohol or drugs or both "to the slightest degree" (DWAI). The defendant relies on a myriad of out-of-state and -circuit law to support his challenge, but he does not consider the Colorado substantive laws that served as the justification for the stop and the minimal nature of reasonable suspicion required to believe he had violated those laws. *See* ECF 25, pp. 7, 10.

As a matter of substantive criminal law, a person "drove" under the DWAI statute when they have "actual physical control over a motor vehicle," which is assessed by: (1)

where the vehicle was found, (2) where in the vehicle the person was found, (3) whether or not the keys were in the motor vehicle's ignition, (4) whether or not the motor vehicle was running, (5) any other factor which tends to indicate the person exercised influence over the vehicle. *People v. Swain*, 959 P.2d 426, 428 (Colo. 1998); Colo. Model Jury Inst. 42:09, cmt. 3 (2021). The fourth factor, the engine's running, is not dispositive but rather figures into the overall thrust of control: whether "it would have taken little effort [] to have put the car in motion." *See Caple v. Department of Rev. of State of Colo., Motor Vehicle Div.*, 804 P.2d 873, 875 (Colo. App. 1990) (motorist was driving despite vehicle was not running); *Swain*, 959 P.2d at 428 (relying on DMV case law as authority).

This substantive law, combined with the minimal nature of reasonable suspicion, means that, in Colorado, reasonable suspicion to make a stop for the crime of DWAI may arise when a police officer sees a person asleep behind the wheel. *People v. Brown,* 217 P.3d 1252, 1256 (Colo. 2009). Here, police were dispatched due to a non-anonymous store employee's call, which was within their collective knowledge at arrival. Officer Tanis was the first to arrive with that information. There, he observed the defendant in the driver's seat with "head forward and leaning toward his lap," indicating to him both by common sense, experience, and specialized training, that the defendant was a driver impaired by a substance. *Id.*; *see Brown*, 217 P.3d at 1256 (at-scene observations of unconscious state provided reasonable suspicion, among other factors). Unlike the drug investigation  where officers found defendant's statement that he had slept previously in a gas station suspicious in *United States v. Batara-Molina*, --- F.4th ---, 2023 WL 2147326, *5 (10th Cir. 2023) [cited at ECF 25, p. 6], the officers here were investigating the

defendant's sleepy state as a direct and permissible fact of actual physical control and impairment under the state's substantive traffic laws.

Officer Tanis further observed keys in the defendant's lap, and headlights and brake lights illuminated. ECF 25-E, p. 11; 25-D (00:10). Although the engine was off (which is only one factor), the defendant was in control of the truck's lights, and thus a reasonable officer would have basis to believe that he could start the engine at any time and was thus in control (and he later attempted to do just that). Adding to the totality, the truck had damage and was at the location for an hour [*see* ECF 25-A; 25-E, p. 11], leading to a reasonable inference that the truck had been in an accident and the driver had been impaired for a significant time.

Under the minimal reasonable suspicion standard, officers did not need to rule out innocent explanations that the defendant was merely tired or the damage was not fresh. Even so, Officer Tanis' reasonable suspicion was so strong that he did not initiate contact with the defendant but rather waited for cover officers to arrive due to safety concerns. *See* ECF 25-E, p. 11. Ultimately, under the defendant's view, it is unclear what the officers could have done in response to the concerned 911 call. *See* ECF 25 p. 4-6 (not addressing the role of that information at all); *compare Chavez*, 660 F.3d at 1222. The purpose of an investigatory stop is to investigate further, which is exactly what the officers did.

### c. Further reasonable suspicion developed when the defendant awoke.

Other officers arrived together shortly and blocked the defendant's truck with their vehicle before making direct contact with the defendant. ECF 25-D (00:10). On their

approach after blocking, officers approached both sides of the vehicle and confirmed Officer Tanis' initial observations. *See id.*, ECF 25-E, p. 4. Upon awaking, the defendant attempted to put keys in the ignition but had difficulty, and briefly ignored the officers' commands, which a *reasonable officer* in the circumstances could interpret as an attempt to flee or that the defendant was not aware of his circumstances due to impairment. *See United States v. Johnson*, 528 Fed. App'x 807, 809 (10th Cir. 2013); *United States v. Harris*, 313 F.3d 1228, 1236 (10th Cir. 2002). *See* ECF 25-C (1:19-1:38). Despite the defendant's suggestion that he was trying to innocently comply [ECF 25, p. 7], a reasonable officer would not have had to draw that conclusion. The totality of these additional observations of his physical control, impairment, and attempt to flee (even if minor) furthered the officer's reasonable suspicion that the defendant was driving and impaired to the slightest degree and that he desired escape to avoid detection as a result. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (evasive behavior is pertinent). When objectively viewed, the police were thus further justified in their commands to exit the vehicle, at which point the defendant submitted and was thus truly seized under the Fourth Amendment. *See* ECF 25-C (1:19-1:38).

### d. The scope of contact was reasonable.

Having a reasonable belief that the defendant committed DWAI, police conducted a standard investigation that included twice-consented SFSTs and natural questioning. The defendant argues that "the totality of circumstances indicated that he was not under the influence of anything" and "should have been released" at the conclusion of the voluntary SFSTs. ECF 25, p. 9-10. In essence, the defendant argues that the police

exceeded the scope of their investigation because a reasonable officer could only conclude that the defendant was not impaired but merely tired. To the contrary, the additional investigation only furthered reasonable suspicion.

Generally, if the defendant's detention is justified by reasonable suspicion, the Court must next consider "whether the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007). If the encounter exceeds those circumstances, probable cause must support continued detention. *Rodriguez-Rodriguez*, 550 F.3d at 1223.

Here, the officers continued an active investigation related to DWAI until formal arrest. Even before SFSTs, officers observed the defendant stumble out of the vehicle for which he had control, appear confused, heavily sway, have blood shot eyes, low speech, and body tremors, all tell-tale signs of impairment. *See United States v. Engle*, 428 F.Supp. 3d 1259, 1259 (D. Wyo. 2019) (similar indicia led the district court to find the defendant had committed federal driving under the influence of drugs beyond a reasonable doubt). The probability that he "was merely tired and not inebriated" was low from early on [*see* ECF 25, p. 9], and the objective standard does not require officers to rule out innocent explanations. Based on these early observations, a reasonable officer, informed by common sense and specialized training, would conclude the defendant was an impaired driver. The SFSTs were directed at furthering investigation of DWAI, and they add to objective reasonable suspicion: the defendant displayed multiple "clues" on the walk-and-turn and one-leg stand tests. *See* ECF 25-E, pp 4-6; *also People v. Marston*,

491 P.3d 412, 423 (Colo. App. 2021) (clues on the walk-and-turn and one-leg-stand tests affirmed as evidence); *United States v. Atkinson*, 128 Fed. App'x. 64, 66 (10th Cir. 2005) (sufficient evidence included the defendant's poor SFST performance).

Officer Hammernik inquired at that point why the defendant was swaying. In the ensuing conversation, the defendant admitted multiple times that he smoked pot but was visibly confused. ECF 25-C (13:10-16:02). Nevertheless, the officer pursued his specialized training in ARIDE testing to investigate DWAI even further, specifically into drugs.[2] *See Engle*, 28 F.Supp. 3d at 1259 (court also relied on ARIDE testing); *Avizu*, 534 U.S. at 274 (reasonable suspicion "allows officers to draw on their own experience and specialized training"); Ex. 1. When additional clues were displayed in these drug-focused tests, any reasonable officer would conclude, in the totality of the circumstances above, that the defendant-driver was impaired by drugs, which the officers subjectively believed was methamphetamine or THC.

## OFFICERS HAD PROBABLE CAUSE.

The defendant also challenges probable cause. ECF 25, pp. 9-10. Also an objective standard, probable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed." *United States. v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007) (cleaned up). Officers need not "rule out all innocent explanations" for probable cause to lie. *Rife v. Oklahoma Dep't of Pub. Safety*,

---

2       Per the National Highway Traffic Safety Administration, ARIDE testing was developed to aid in identifying drug impaired drivers. https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/aride_participant_manual-tag.pdf, p. 28 (accessed March 13, 2023).

854 F.3d 637, 644-45 (10th Cir. 2017). At any point by the time arrest was made by handcuffs, a reasonable officer would have developed concurrent probable cause for DWAI based on the totality of the circumstances identified above: the dispatch information, the defendant's control of the truck, his unconscious state and actions upon awaking, observations of his physical and mental state, his statements, and his performance on the voluntary SFSTs.

### THE DEFENDANT WAS NOT IN CUSTODY DURING THE INVESTIGATION

The defendant argues that he was subject to custodial interrogation, so as to require *Miranda* warnings, at the point Officer Hammernik spoke with him after the first round of SFSTs. *See* ECF 25, p. 14; 25-C (13:33). The government disagrees that the defendant was in custody at this point. The government, however, agrees that the defendant was formally arrested at the point of handcuffing [ECF 25-C (22:19)] and will not seek to admit remaining statements outside of impeachment.[3]

"An individual is in custody for *Miranda* purposes when 'a reasonable person in the suspects position would understand his or her situation as the functional equivalent of formal arrest.'" *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (cleaned up). Relevant factors include: (1) whether the circumstances demonstrated a police-dominated atmosphere, (2) whether the nature and length of the officers' questioning was

---

3    The defendant does not challenge that any statements in this case were obtained involuntarily, and the government requests the Court find any challenge untimely and waived. *See* ECF 25, pp. 13-15 (only challenging custodial status). Nonetheless, the government asserts that all statements at any point were voluntary by a totality of the circumstances, as there was no coercive police activity per, e.g., *United States v. Cash*, 733 F.3d 1264, 1279-80 (10th Cir. 2013). In this manner, all statements should be available for impeachment at trial. *See Kansas v. Ventris*, 556 U.S. 586, 594 (2009).

accusatory or coercive, and (3) whether the police made the defendant aware that he or she was free to refrain from answering questions. *Id.* No factor is dispositive. *See id.*

Fundamentally, traffic stops do not usually implicate *Miranda* concerns since a traffic stop is typically noncoercive and non-threatening. *United States v. Bernard*, 680 F.3d 1206, 1211 (10th Cir. 2012). In *Bernard*, the defendant was ordered out of the car and patted down revealing contraband. In response to a question, he admitted that marijuana was found, at which point he was handcuffed and charged. The Tenth Circuit concluded that these orders were a "permissible part of a routine traffic stop" so as to not invoke *Miranda* and its suppression of the defendant's statements. *Id.*

As in *Bernard*, police actions in the instant case "were a far cry" from coercion in an intense, police-dominated atmosphere. Considering the *Guillen* factors: the defendant was not in custody. The encounter took place in a public location, and officers were conversational and non-threatening throughout. He was not surrounded; other officers present were not even paying attention during much of the encounter. The defendant was not handcuffed until conclusion of the investigation, and weapons were never drawn. Officer Hammernik confronted the defendant as to his observations, but his statements were not accusatory to rise to coercive levels. Indeed, the defendant was not threatened with physical mistreatment or restraint, and he actively participated in the questioning in attempt to give innocent explanations for the circumstances that night. *See United States v. Salazar*, 2020 WL 520941, *33 (D. New Mexico Jan. 31, 2020) (unpublished) (noting that the Tenth Circuit articulated these "hallmarks of coercion" in the custodial context in *United States v. Sanchez-Gallegos*, 412 F. App'x 71, 73 (10th Cir. 2011) (Ebel, J.,

14

concurring)). Furthermore, he was asked for and did consent, twice, to SFSTs, which directly elucidates the non-coercive environment.

*Miranda* only applied when officers placed the defendant in formal arrest by handcuffs, ECF 25-C (22:19). The government agrees at this point forward *Miranda* applied and thus would not seek their admission outside of impeachment. Thus, the issue is moot. *See, e.g., United States v. Cota-Herrera*, 75 Fed. App'x 695, 699 (10th Cir. 2003).

## <u>THE GOVERNMENT WILL NOT ADMIT FRUITS OF THE SEARCH WARRANT</u>

The defendant also argues that the warrant to search the defendant's truck was unreasonably delayed. ECF 24, p. 10-11. The government does not concede to the defendant's facts or reasoning for suppression but will not admit evidence of the warrant or the fruits of the search at trial. Thus, this issue is also moot. *See Cota-Herrera*, 75 Fed. App'x at 699.

## <u>CONCLUSION</u>

The Court should deny the defendant's motion to suppress the investigatory stop and statements made before he was handcuffed.

DATED March 17, 2023.

COLE FINEGAN
United States Attorney

<u>s/ Albert Buchman</u>
ALBERT BUCHMAN
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Al.Buchman@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 17, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

<u>s/ *Lauren Timm*</u>
LAUREN TIMM
Legal Assistant
United States Attorney's Office