# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.    22-cr-00329-RMR

UNITED STATES OF AMERICA,

    Plaintiff,

v.

LEWIS BURTON RIDGEWAY,

    Defendant.

---

**DEFENDANT'S REPLY TO UNITED STATES'S RESPONSE (DOC. NO. 32)
TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS
(DOC. NO. 25)**

---

## ARGUMENT

**I.    The seizure began when police blocked in Mr. Ridgeway's truck.**

Relying on a Colorado Supreme Court case, the government contends that a sleeping person cannot be seized under the Fourth Amendment because he has not perceived, and therefore cannot submit to, an officer's show of authority. (Doc. No. 32 at 5-6 (citing *Tate v. People*, 290 P.3d 1268, 1269-70 (Colo. 2012).) No federal appellate court has adopted this rule and for good reason; it relies on a fundamental misunderstanding of the different types of Fourth Amendment seizures.

As the Supreme Court recently explained, there is a "distinction between seizures by *control* and seizures by *force*." *Torres v. Madrid*, 141 S. Ct. 989, 1001 (2021). "[A] seizure by acquisition of control involves either voluntary submission to a show of authority **or the termination of freedom of movement**." *Id.* (emphasis added). As an example of the latter type of seizure, the *Torres* Court referenced the police roadblock at issue in *Brower v. County of Inyo*, 489 U.S. 593, 598-99 (1989), wherein the Court recognized that it was "enough for a seizure that a person be stopped by the very

instrumentality set in motion or put in place in order to achieve that result." 489 U.S. at 599. Accordingly, because the roadblock was "not just a significant show of authority to induce a voluntary stop, but [was] designed to produce a stop by physical impact if voluntary compliance [did] not occur," *id.* at 598, it effectuated a seizure when the complainant "was meant to be stopped by the physical obstacle of the roadblock—and [] he was so stopped," *id.* at 588.

So too here. The officers' act of blocking Mr. Ridgeway's car into its parking space was meant to stop him from leaving, and he was so stopped. Because it constituted a termination of his freedom of movement, it thus constituted a seizure regardless of whether he was awake at the time. *See Torres*, 141 S. Ct. at 1001 (locking person in room constituted a seizure by terminating freedom of movement); *see also United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (defendant was seized the moment that officer parked his patrol cruiser directly behind defendant's car and blocked it in, notwithstanding the fact that defendant was asleep at the time).

Moreover, even if "voluntary submission to a show of authority" were the proper test under these circumstances, that submission took place seconds later when Mr. Ridgeway awoke, surrounded by officers, and stayed put. *See Brendlin v. California*, 551 U.S. 249, 262 (2007) ("what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away"); *United States v. Delaney*, 955 F.3d 1077, 1085 (D.C. Cir. 2020) (seizure when officers pulled into parking lot and blocked defendant's vehicle from exiting; defendant had submitted to their authority "by staying inside" the car and "not getting up to run away"). The government makes much of the fact that Mr. Ridgeway put his key into the ignition after he was twice ordered to roll down his window, asserting that a reasonable officer would have interpreted this conduct as a refusal to submit and an attempt to flee. (Doc. No. 32 at 10.) This characterization makes little sense under the circumstances, where his options to "flee" were to

either drive his truck into the glass doors of the 7-Eleven entryway or to ram backwards into the fender of the parked and immovably large SUV police cruiser. Given these "options," it is far more likely that a reasonable officer would have interpreted Mr. Ridgeway's action for what it actually was—an attempt to turn on the truck so that he could comply with Officer Rollins' twice-repeated order to roll down his window.

## II.     The community-caretaking exception does not apply.

The government contends that "it does not argue but does not concede the applicability of the community caretaker exception," noting that welfare checks are permissible in Colorado based on the state's interpretation of the Fourth Amendment. (Doc. No. 32 at 4 n.1.) It's not exactly clear what this footnote means, but the government appears to have missed the point. Mr. Ridgeway does not contend that welfare checks are unreasonable under federal constitutional law. He argues only that the community-caretaking exception—which permits certain non-investigative police activities such as welfare checks—does not apply in this case because the officers' actions were not "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

Here, where the government has argued that officers were "in fact, suspicious of unlawful activity," and the government does not substantively address or even attempt to "justify [police] actions in this case under the community caretaking doctrine[,]" the Court should decline to apply it. *See United States v. Bailey*, No. 2:06-CR-200-TS, 2006 WL 2932370, at *5 (D. Utah Oct. 10, 2006) (refusing to address community-caretaking issue where government failed to adequately invoke it).

## III.    Officers lacked reasonable suspicion to support the seizure.

The government contends that at the time of the initial seizure, officers had reasonable suspicion to believe Mr. Ridgeway was committing two crimes: (1) a traffic infraction in violation of Colorado Revised Statute Section 42-3-202, for failure to attach a front license plate to his truck; and

3

(2) driving while ability impaired (DWAI). (Doc. No. 32 at 6-6.) Both attempts to justify the seizure fail.

### A. The license plate violation does not provide reasonable suspicion

While Mr. Ridgeway does not dispute that the 911 caller informed dispatch that the truck lacked a front license plate, or that dispatch transmitted that information through the police CAD system, neither Officer Rollins nor Officer Hammernik had actual knowledge of the license plate violation when they effectuated the seizure. In the body worn camera footage, none of the officers ever mentioned the truck's lack of a front license plate. Nor did any of the police reports mention a potential violation of Colorado Revised Statute Section 42-3-202. Further, when this incident was being prosecuted in state court, Officer Hammernik never once mentioned that the truck lacked a front license plate during the suppression hearing. As the government acknowledges (Doc. No. 32 at 5), reasonable suspicion is determined by evaluating the facts within the officers' actual knowledge at the time of the seizure. *See United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (courts must "assess whether the facts available to [the officer] at [the] time [of the potentially unlawful seizure] were sufficient to establish reasonable suspicion"). As a result, the 911 dispatcher's knowledge cannot be constructively imputed to the officers on the scene for the purposes of determining reasonable suspicion. *See United States v. Whitley*, 680 F.3d 1227, 1234 n.3 (10th Cir. 2012). Accordingly, the officers' lack of awareness regarding the license plate violation prevents the government's post-hoc attempt to rely on it.

But should the officers claim at the hearing to recall a specific memory of the truck lacking a front license plate—notwithstanding the fact that officers failed to mention any license plate violation in the body worn camera recordings, anywhere in their reports, or during their state court testimony and the fact that the encounter happened nearly a year ago—it still would not carry the day. First, the government cites no authority for the proposition that officers can conduct a routine

4

"traffic stop" of a car that is legally parked on private property. (*See* Doc. No. 32 at 6-7.) But assuming this premise is correct, the officers were thus required to act diligently to complete the traffic-based tasks related to front license plate violation, such as checking Mr. Ridgeway's license and registration, and issuing a violation or warning, if necessary.

"To be reasonable, a traffic stop must be justified at its inception and the officer's actions must be 'reasonably related in scope' to the 'mission of the stop.'" *Frazier*, 30 F.4th at 1173 (citation omitted). Consequently, "an officer's authority to seize the occupants of a vehicle ends when 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *Id.* (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). "Reasonableness in this context is defined by what the officer actually does." *Id.* (citing *Rodriguez*, 575 U.S. at 354).

Here, if the government is correct that the "mission of the stop" was investigating Mr. Ridgeway's license plate violation, then the seizure was unlawful for the separate reasons that the officers' actions were not "reasonably related in scope" to the violation, and that officers failed to work diligently to complete "tasks tied to the traffic infraction." Officers ordered Mr. Ridgeway out of the truck, immediately frisked him, and then ordered him to walk away from the truck to question him about drug and alcohol use. They asked not a single question nor took a single action to address the purported license plate violation. Given that officers neglected to mention the missing front license plate even once during the encounter, their actions cannot be reasonable if the justification at the seizure's inception was to investigate the license plate violation.

### B. Officers lacked reasonable suspicion to believe that Mr. Ridgeway was committing the crime of DWAI.

To the extent that the government intends to suggest that the officers only needed "minimal" reasonable suspicion because the crime of DWAI prohibits driving while affected by drugs or alcohol "to the slightest degree," (Doc. No. 32 at 7), it bears stating that the federal standard of reasonableness under the Fourth Amendment does not bend for the vagaries of state

5

statutes. *See Bowling v. Rector*, 584 F.3d 956, 966 (10th Cir. 2009). The proper test remains whether officers had a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The government failed to meet its burden here.

Citing only to *People v. Brown*, 217 P.3d 1252, 1256 (Colo. 2009), the government contends that because the crime of DWAI prohibits driving while affected by drugs or alcohol "to the slightest degree," police officers in Colorado have reasonable suspicion to effectuate a *Terry* stop upon observing a person sleeping behind the wheel of a parked car. (Doc. No. 32 at 8.) Assuming for a moment that *Brown* has any persuasive force, its actual rule differs slightly (but importantly) from the government's characterization. *Brown* states that reasonable suspicion to investigate DWAI "may arise when a police officer sees a person asleep behind the wheel of a car **with its engine running**." 217 P.3d at 1256 (emphasis added). Of course, Mr. Ridgeway's engine was not, in fact, running when police seized him. (*See* Doc. No. 25, Ex. E at 5, 13.)

Moreover, any persuasive value that *Brown* might have had is lost upon further evaluation, as its statement about reasonable suspicion is not based on federal constitutional law and its facts are wildly dissimilar to the case at hand. The authorities that *Brown* cites for its general proposition that sleeping behind the wheel provides police with reasonable suspicion are three license revocation decisions involving express and implied consent statutes, none of which discuss the Fourth Amendment generally or the federal reasonable suspicion standard specifically. 217 P.3d at 1256. Additionally, the circumstances the police faced in *Brown* could not be more distinguishable from those at issue here. The police in *Brown* were responding to a "shot-fired person-down" 911 call when they came upon the defendant's vehicle, which was resting up against a private fence, obstructing a public sidewalk, and idling in reverse gear; extremely loud music was playing in the vehicle and the vehicle's occupants were unconscious and did not wake when officers yelled to them

6

"at screaming level." *Id.* It was under these circumstances that the *Brown* court held the police had reasonable suspicion to believe that the unconscious driver was under the influence. *Id.* As a result, *Brown* is simply inapposite and fails to justify the police action here.

The government cites not a single case from any jurisdiction finding reasonable suspicion under circumstances similar to those present here. (*See* Doc. No. 32 at 10 (citing *United States v. Johnson*, 528 F. App'x 807, 809 (10th Cir. 2013) (reasonable suspicion to believe defendant was armed and dangerous due his "excessive nervousness and strange behavior," and his failure to keep his hands on the steering wheel as police ordered); *United States v. Harris*, 313 F.3d 1228, 1236 (10th Cir. 2002) (reasonable suspicion to believe defendant was armed and dangerous where he was acting nervously and refused to take his hands out of his pockets as police ordered)).)

Instead, the government attempts to invoke the officers' "experience and specialized training" in an effort to justify the seizure, asserting that the fact that Mr. Ridgeway was in the driver's seat with his "head forward and leaning toward his lap" indicated to the trained and experienced officers that Mr. Ridgeway "was a driver impaired by a substance." (Doc. No. 32 at 8.) This effort also misses the mark. In the Tenth Circuit, deference to "specialized training and experience" of police "becomes inappropriate when an officer relies on a circumstance incorrigibly free of associations with criminal activity." *Frazier*, 30 F.4th at 1174 (citation omitted); *see also United States v. Batara-Molina*, 60 F.4th 1251, 1258 (10th Cir. 2023) ("Courts should not deem an action reasonably suspicious if it 'describe[s] a very large category of presumably innocent travelers.'" (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). The fact that Mr. Ridgeway was sleeping in a legally parked car, at night, and in a position consistent with someone dozing in an upright chair undoubtedly constitutes "a circumstance incorrigibly free of associations with criminal activity." Just as "the presence of a bag in a vehicle adds nothing to the reasonable suspicion calculus" because

7

"[i]t is merely evidence of travel," *Frazier*, 30 F.4th at 1174, Mr. Ridgeway's sleeping status contributes nothing toward reasonable suspicion, as it is merely evidence of fatigue.

In sum, the government's evidence falls far short of meeting its burden to prove that officers had reasonable suspicion to believe Mr. Ridgeway was engaged in criminal activity when they seized him. Accordingly, Mr. Ridgeway respectfully requests that the Court grant his motion and suppress all evidence and statements deriving from the unlawful stop.

**IV.     *Guillen* warrants suppression of Mr. Ridgeway's pre-handcuffing statements.**

The government cites to *United States v. Bernard*, 680 F.3d 1206, 1211 (10th Cir. 2012), asserting that "traffic stops do not usually implicate *Miranda*" since they are "typically noncoercive and non-threatening." (Doc. No. 32 at 14.) This is true. But the government's reliance on *Bernard* is misplaced for several reasons. First, the encounter here was not a traffic stop; Mr. Ridgeway was not pulled over while driving, he instead awoke in his parked truck boxed in and surrounded on every side by police. Second, and much more importantly, it matters not whether traffic stops usually implicate *Miranda*, but whether the stop here did implicate *Miranda*. And under the Tenth Circuit's rule in *Guillen*, it is clear that *Miranda* was implicated the moment that Officer Hammernik confronted Mr. Ridgeway with an accusation and apparent certainty of Ridgeway's guilt in committing DWAI because the situation presented the functional equivalent of formal arrest. *See United States v. Guillen*, 995 F.3d 1095, 1111(10th Cir. 2021).

The government contends that *Guillen* does not apply because the encounter took place in a public location; the officers were "conversational and non-threatening throughout"; Mr. Ridgeway "was not surrounded" by officers or in handcuffs at this point; "weapons were never drawn"; and Mr. Ridgeway "was not threatened with physical mistreatment or restraint." (Doc. No. 32 at 14.) But other than the public location, these "hallmarks of coercion," (*id.*), were not present in *Guillen* either. *See Guillen*, 995 F.3d at 1109-11. Rather, *Guillen* turned on the "accusatory nature" of the police

8

questioning and the fact that the agent "pressed [the defendant] despite his repeated denials of involvement and then confronted him with the mounting information and evidence collected" against him. *Id.* at 1110. "Considering the evidence the agents had discovered, an arrest was likely, and—after being confronted with that evidence—a reasonable person in [the defendant's] shoes would have recognized as much. Thus, [the defendant] would have reasonably understood his situation as the functional equivalent of formal arrest[.]" *Id.* at 1111.

Officer Hammernik used the same techniques and put Mr. Ridgeway in the same situation here. He directly accused Mr. Ridgeway of being under the influence and continued to press him, notwithstanding Mr. Ridgeway's repeated denials of inebriation, and then confronted him with the purported evidence of him swaying and showing other signs of impairment. Given Hammernik's accusations and alleged evidence of DWAI, a reasonable person in Mr. Ridgeway's shoes would have recognized that an arrest was likely and understood his situation to be the functional equivalent of formal arrest. Accordingly, the Court should suppress all statements that Mr. Ridgeway made in response to this round of questioning and thereby prevent the government from relying on such statements to attempt to prove probable cause at the suppression hearing. *See United States v. Chavez*, 985 F.3d 1234, 1245-46 (10th Cir. 2021) (unmirandized statements cannot be used to support probable cause at an evidentiary hearing).

/ / /

9

## CONCLUSION

For the above reasons, Mr. Ridgeway respectfully requests that the Court issue an Order suppressing all evidence, including physical evidence and statements allegedly given by him, whether oral, written, or otherwise recorded, which police obtained through unconstitutional seizures, searches, and interrogations.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Jennifer Beck
JENNIFER BECK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
Jennifer_Beck@fd.org
Attorney for Defendant


s/ Amy W. Senia
AMY W. SENIA
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
Amy_Senia@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2023, I electronically filed the foregoing ***Defendant's Reply to Government's Response to Defendant's Motion to Suppress Evidence and Statements*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail address:

Al Buchman, Assistant United States Attorney
Email: Al.Buchman@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Lewis Burton Ridgeway (Via U.S. Mail)

s/ Jennifer Beck
JENNIFER BECK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
Jennifer_Beck@fd.org
Attorney for Defendant

11